UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

-v-                          Case No. 08-11887

GREGORY MCKNIGHT, et al.,

Defendants./

**MOTION HEARING (AMENDED TRANSCRIPT)**
**BEFORE HON. MAGISTRATE JUDGE VIRGINIA M. MORGAN**
United States District Court Magistrate Judge
624 U.S. Courthouse
231 West Lafayette
Detroit, Michigan 48226

**(Thursday, February 5, 2009)**

APPEARANCES:        JOHN E. BIRKENHEIER, ESQUIRE
                    JAMES G. O'KEEFE, ESQUIRE
                    Appearing on behalf of the Securities
                    and Exchange Commission.

                    STEVEN SPENDER, ESQUIRE
                    M. ALLEN ROBB, ESQUIRE
                    Appearing on behalf of Petitioners
                    Spender & Robb.

                    RICHARD ROTH, ESQUIRE
                    Appearing on behalf of Petitioner
                    Roth Law Firm.

                    JOEL D. APPLEBAUM, ESQUIRE
                    Appearing on behalf of Receiver
                    Robert Gordon.

COURT RECORDER:     NOT IDENTIFIED.

TRANSCRIBED BY
(NOT PRESENT):      MARIE METCALF, CSMR, CVR, CM
                    Official Court Reporter
                    257 U.S. Courthouse
                    231 W. Lafayette
                    Detroit, Michigan 48226
                    (248)345-1471

**TABLE OF CONTENTS**

Proceedings – Thursday, February 5, 2009

*Marie Metcalf, CVR-CM*

*SEC v. McKNIGHT*

Detroit, Michigan

Thursday, February 5, 2009

At about 9:54 a.m.

\*     \*     \*

COURT CLERK:  All rise.  The United States District Court for the Eastern District of Michigan is now in session, the Honorable Virginia M. Morgan, United States Magistrate Judge presiding.

The Court calls case number 08-11887, SEC versus Gregory McKnight.  Will counsel please step forward and identify themselves for the record?

MR. SPENDER:  Good morning, Your Honor. I'm Steven Spender.  I represent the petitioner, Spender & Robb.

THE COURT:  Okay.

MR. ROBB:  Good morning, Your Honor. Allen Robb of Spender & Robb.

THE COURT:  Okay.

MR. ROTH:  Good morning, Your Honor. Richard Roth of the Roth Law Firm.

THE COURT:  Okay.

MR. BIRKENHEIER:  Good morning, Your Honor.  John Birkenheier on behalf of the Securities and Exchange Commission.

THE COURT:  Okay.

*Marie Metcalf, CVR-CM*

3

MR. O'KEEFE:  Good morning, Your Honor. Jim O'Keefe on behalf of the Securities and Exchange Commission.

THE COURT:  Okay.

MR. APPLEBAUM:  Good morning, Your Honor. Joel Applebaum, Clark Hill, on behalf of the receiver, Robert Gordon.

THE COURT:  Okay.  This is petitioner's motion and brief for an order authorizing and directing the receiver to pay Spender & Robb and the Roth Law Firm.

The SEC has filed a response.

The receiver has not filed a response; is that correct?

MR. APPLEBAUM:  That is correct, Your Honor.

THE COURT:  Okay.  So you want us to go ahead without -- I'm not -- I know Mr. Applebaum and he's an honorable person, but I'm not going to go ahead on anything without a written statement from the receiver.

MR. APPLEBAUM:  Could I address that issue, Your Honor?

THE COURT:  Sure.

MR. APPLEBAUM:  Your Honor, the issue from the receiver's point of view was --

THE COURT:  You know I love you, but I'm

*Marie Metcalf, CVR-CM*

4

not inclined to do your work for you.

MR. APPLEBAUM: Correct. We're not objecting to the application.

Let me just -- a little background. The issue between the SEC and the petitioners are over whether or not, you know, as a legal issue, they are entitled to the fees.

If I put the receiver -- coming at this from a bankruptcy lawyer's point of view, we had originally --

THE COURT: What do you mean, where -- da-da-da-da-da-da -- you're not in bankruptcy court.

MR. APPLEBAUM: I appreciate that, too.

THE COURT: That was "Anything Goes," in case you missed it.

MR. APPLEBAUM: No, no. We had said, without -- obviously subject to Court approval, we had said to Mr. Robb and Mr. Roth's parties that to the extent you did work at our request or that we instigated and to the extent that it benefited the estate, we would not oppose your getting paid for that work.

The SEC didn't agree with that position for the reasons that I'll let them get into.

THE COURT: Yeah.

MR. APPLEBAUM: But that was the position

of the receiver with respect to work that we believe benefitted the estate or that we somehow induced them to perform almost like a quantum meruit.  And that was our -- and that's why we haven't filed a --

THE COURT:  But there isn't a bankruptcy estate, is there?

MR. APPLEBAUM:  There is a receiver's estate.  I'm sorry.  The receiver was appointed over the -- what's called an order of the receiver estate.

THE COURT:  Right.  But there's no bankruptcy proceeding?

MR. APPLEBAUM:  No bankruptcy proceeding.

THE COURT:  And Judge Steeh, I know, invited you to file a response to the motion, and in lieu of them, I suppose a motion that you could have brought to authorize payment for work that you deemed appropriate.

MR. APPLEBAUM:  We were going to originally file a motion for authorization to allow us to pay the fees that we went through and deemed reasonable and necessary and whatever the terms are.

We ultimately elected not to do that at the request of the SEC, and petitioners filed a motion seeking payment.

THE COURT:  For the same monies that you

believed was --

MR. APPLEBAUM:  The same amount, correct.

THE COURT:  Okay.

MR. APPLEBAUM:  And there may be some -- an issue of terms of the calculation.

THE COURT:  And you decided -- and you might be -- but you didn't file a written response that all of this was reasonable or necessary or done at your request or anything like that?

MR. APPLEBAUM:  They said it in the affidavit and we weren't disputing it.  It was their motion and we didn't feel it appropriate, you know -- we're not backing away from our position.  We just don't feel --

THE COURT:  Aren't you asking for -- won't you be eventually asking for receiver fees?

MR. APPLEBAUM:  The receiver asks for receiver fees.

THE COURT:  Uh-huh.

MR. APPLEBAUM:  Yes.  But these are not the receiver's fees.

THE COURT:  Right.  But you would have been -- it's not like you would have done this work to file the motion and then later not be compensated.  Had you filed a response, eventually you would be

*SEC v. McKNIGHT*

compensated.

MR. APPLEBAUM:  Oh, yeah.  It wasn't because we were afraid of not getting paid that we didn't file the response.  We just didn't feel that the response -- the position was laid out accurately in the affidavit, so we didn't feel that -- you know, we thought we'll just come to court.

Our feeling was, from the inception, we knew that the SEC had issues with respect to the payment of their fees.  Petitioners knew or know that the SEC was going to have payment.  We got it to what we felt was --

THE COURT:  Aren't you essentially working on behalf of the SEC to obtain assets that then would be used to distribute to the investors?

MR. APPLEBAUM:  We're working on behalf of the receiver estate that the Securities and Exchange Commission petitioned to have created.

THE COURT:  Right.  So essentially --

MR. APPLEBAUM:  But we are not the representatives of the SEC.  They represent themselves.  So the position of the SEC may differ at times from the position of the receiver.

And the position of the receiver with respect to these fees was, to the extent we induced you to perform them or to the extent they benefitted the

estate, we felt we could come in and say "We have no problem with the payment of them."

THE COURT:  Okay.  I --

MR. APPLEBAUM:  So we're not objecting to the payment of the fees.

THE COURT:  Well, but you're not making an affirmative statement that these are reasonable and necessary for the estate.

MR. APPLEBAUM:  I can make that statement.

THE COURT:  Well, you know, Judge Steeh gave you an opportunity to do so and -- okay.  All right.

MR. APPLEBAUM:  The reason I say that is we did not -- we didn't feel it necessary to file a written response and incur the cost because we weren't disputing the statements in the affidavits.

If we had felt that the affidavits were inaccurate, we would have absolutely have corrected the record.  But we didn't feel we had to take an affirmative position.

THE COURT:  But the thing -- it's difficult because their saying -- each side is saying different things.  And without your taking a position, certainly you can't -- you can't say that you're agreeing with them when you're hired by them, that you're agreeing with the petitioners when you're hired by the SEC?

MR. APPLEBAUM:  Well, we weren't hired by the SEC.

THE COURT:  You know what I mean.

MR. APPLEBAUM:  Well, I know, but I --

THE COURT:  That you're supposed to be on the same side of the fence, relatively speaking, to collect assets.

MR. APPLEBAUM:  And we are.  And the work that we believe performed helped and assisted in the doing of that in an economic way.

THE COURT:  Okay.

MR. APPLEBAUM:  So in terms of the economics, we felt -- and we went through the bills very carefully and negotiated reductions and what have you.

I think the SEC's position is as a matter of law they're not entitled to be paid for this.

THE COURT:  Okay.

MR. APPLEBAUM:  And that's the disagreement.

THE COURT:  Okay.

MR. APPLEBAUM:  Thank you.

THE COURT:  May I hear from the petitioners?

MR. ROTH:  Yes, Your Honor.  We're both going to speak if it's okay with the Court.  Richard Roth

*SEC v. McKNIGHT*

on behalf of the Roth Law Firm.

Just by way of background, Your Honor, I've been involved in this Legacy dispute with the SEC for certainly well over a year. And the allegations were -- there's been a default taken.

But the allegations were essentially that Mr. McKnight and his company nationwide solicited people to have them loan money and then he would give 12 and-a-half, 12 percent interest a month.

THE COURT: Kind of like Madoff-light.

MR. ROTH: Yeah, exactly. Predating Madoff, but the -- but the timing is -- it's certainly sort of becoming the scam of the era.

In any event, Your Honor, in or about May 5th of 2008, the SEC came down exactly like Madoff and they --

THE COURT: No. They actually never hardly ever came down on Madoff until he confessed.

MR. ROTH: Well, he's not in jail yet, Judge, so I can't figure that one out. That's another whole story.

THE COURT: That's hopefully not these players.

MR. ROTH: Yeah. Anyway, they came down in this way.

*Marie Metcalf, CVR-CM*

THE COURT: But that is one of the issues, you understand.

MR. ROTH: What?

THE COURT: The SEC, that -- you know, ah they know that. This isn't cocktail conversation.

MR. ROTH: On May 5th, I believe it was May 5th, 2008, they had -- they got from a federal court judge an injunction, an order which froze assets, the appointment of a receiver and they start a lawsuit.

The receiver was then appointed by the Court. And the receiver's job was to independently, what the receiver is always supposed to do, gather the assets.

THE COURT: Right.

MR. ROTH: The people that knew the most about anything involving Mr. McKnight and Legacy was Mr. Robb and myself, myself having been engaged in representing Legacy for over a year. I was in Chicago with the SEC. I think it was in January of last year, long before this -- five months before the receiver came down.

So we had conversations with the receiver and we told the receiver that we can -- "If you want our assistance, we will help you gather assets. We will help you determine --" there are thousands of people across the country. We therefore, had a conversation with them.

They could have hired any law firm they wanted to assist them in obtaining these assets, learning more information, because quite frankly, the timing which is true in all these cases was a matter of days before there would be a response to the injunction, response to the complaint, and then it was a matter of weeks and months.

And the concern about the receiver, quite frankly, was, we want to freeze all the assets, we want access to all the assets, we want to get everything we can, so that we can then be in a position to report to the Court that we did what we were supposed to do.

So then we had conversations, both Mr. Robb independently and myself, had conversations with Mr. Applebaum telling them if they want us we can do it.  I had a very specific conversation with Mr. Applebaum where I reduced my hourly rate to a blended rate, I told him what I was going to do.  I sent him budgets.  He wanted me to fly to Flint.  We did all of this to help the receiver.

And the net effect, Your Honor, is that we helped him gather -- it's in our motion, Your Honor, I think it's letters A through II.  We helped them get a Mercedes.  We helped them get cash.  We helped them get -- apparently this is -- they don't have it yet, but there's over $2 million that's going to be coming to the

receivership, partially as a result of my efforts as well as the U.S. Attorney in Washington, D.C. and Mr. Robb's efforts, we have helped them get a -- locate a server in Panama.  We did an inventory of all the product.  We really have been working side-by-side with the receiver for many months in an attempt to, if you will, help it gather as much as it could.  The agreement was, "You will do the work.  We will --"

THE COURT:  But this is not in writing.

MR. ROTH:  Your Honor, it's not -- well, there's several e-mails that go back and forth.  And, Your Honor, the best writing I could tell you is that the receiver actually said they would make the application. The receiver drafted an application.  And it's part of our papers.

The receiver actually drafted an application for us to get paid after we went through -- every month went through our bills.  They showed it to us, we had no problem with it.

They showed it to the SEC, the SEC objected.  And as a result, the receiver said, "You know what, if you want to get paid, make your application.  We won't object to it, because our agreement was," and Mr. Applebaum stood before the Court and told you that we did have an agreement, we have an agreement as it stands.

Our agreement was, "we're going to work out a -- we worked out how much you're going to get paid, the rate you're going to get paid, what you're going to do, and we're going to not oppose your application."

So we, therefore, are here on that application. We put a lot of time into this, Your Honor. We brought in a lot of assets to the estate. There are several e-mails which I can point out if the Court wants, which indicate there was an agreement.

I wouldn't have flown to Flint, Michigan and gone through an inventory and given Mr. Applebaum a budget if I didn't think I had an agreement. Mr. Applebaum, we agreed there's no -- there's a meeting of the minds between the receiver and the lawyers.

The SEC's objection as I understand it, is that we shouldn't be paid to help out the defendant. Well, truth be told, while we represented the defendant, it wasn't to help the defendant. We took a default like this, we consented to an injunction like this, we consented to a TRO, we consented to everything. And we had papers drawn up and signed.

So all of our efforts, Your Honor, 99.9 percent of our efforts were not to advance the defendants, because the defendant, within two weeks of the commencement of the action was done. Default was

entered, injunction -- a permanent injunction was obtained. All we were doing --

THE COURT: There's still a possibility of an ongoing criminal case, is there not?

MR. ROTH: Yeah, there was.

THE COURT: There was a complaint. It was dismissed. It looks like somebody's trying to work something out.

MR. ROTH: Yeah, and we didn't have anything to do -- I don't --

THE COURT: I'm sorry. There are conversations or requests for reimbursement either from you or the other guy with Mr. Wishnow who was his court-appointed federal defender.

MR. ROTH: Well, we were -- I'll tell you --

THE COURT: And there's stuff for the daughter and her living expenses and her college expenses. I mean, I don't know what you're trying to pull, but this is not bankruptcy court.

MR. ROTH: Your Honor, there's two things you raise. Let me talk first about Mr. Wishnow. There's a very good reason for it. The SEC was trying to obtain information from Mr. McKnight as to the location of assets.

I'm not a criminal lawyer.  And I said I will help the SEC out, however -- Your Honor, if I could finish, I need to speak to Mr. Wishnow, because I don't want to be the one to waive his Fifth Amendment privilege.  I don't really know where the line is.

So there were many conversations with Mr. Wishnow so we could therefore attempt to help the SEC out as much as we could, but not interfering with Mr. Wishnow's representation and Mr. McKnight's rights.

THE COURT:  But of course, all that does benefit Mr. McKnight in a criminal case, because if he has cooperated and returned assets, he's going to get a better deal and stay out of jail.

MR. ROTH:  But my purpose here was to not interfere with his rights, because he was represented by independent counsel, Mr. Wishnow, and to try to help the SEC out.

Therefore, I said to him, "I can't give you oral statements, but we can give you documents," as I understand the Fifth Amendment privilege lies.  So we tried -- it was a balancing, Your Honor.  We tried to do as much as we could for the SEC, and for the receiver, if you will, to get them information as well as making sure that Mr. Wishnow wouldn't waive Mr. McKnight's rights.

I didn't advise Mr. McKnight on what his

rights were.  I'm not a criminal lawyer.

THE COURT:  He had a criminal lawyer.

MR. ROTH:  Yes, he did.

THE COURT:  He had an Assistant U.S. Attorney that the criminal lawyer was dealing with.

MR. ROTH:  Correct.

THE COURT:  He has -- and there is the SEC and there is a receiver.  I don't understand why you felt it was necessary for you somehow to jump in and become the liaison between all this.

MR. ROTH:  Your Honor, I didn't believe it was necessary.  We had several, several, several conversations with the receiver.  The receiver one day is faced with this pretty large federal court lawsuit.  And I told him, if you want, we will help you.  I have been involved -- I have boxes in my office.

THE COURT:  But why --

MR. ROTH:  Again, Your Honor, I didn't --

THE COURT:  Why should the taxpayers and the investors pay your fee when already this guy is entitled to court-appointed counsel, got court-appointed counsel, has court-appointed counsel to find these assets, disgorge them, pay them over, because it's all of a benefit to him in the criminal case?

MR. ROTH:  Your Honor, the answer is very

simple.  But for Mr. Robb and I, they wouldn't have gotten the Mercedes, they wouldn't have gotten $2 million out of Washington, D.C.

THE COURT:  Which they still don't have.

MR. ROTH:  Which apparently they still don't have, but Mr. Applebaum said they're expecting it any day.

THE COURT:  So other than getting a used car back, --

MR. ROTH:  I'm not done.

THE COURT:  -- what have you done for the estate lately?

MR. ROTH:  Your Honor, we set forth in our motion papers letter after letter of all the things we did, including --

THE COURT:  I know you did these things.

MR. ROTH:  Yes.

THE COURT:  So how much money have you put back in the estate?

MR. ROTH:  Oh, how much money we put back -- I would have to ask the receiver.  We turned over assets, we turned over cash.  I know the $2 million is there, because the $2 million is sitting in a U.S. Attorney's Office trust account.  It's not like it's going anywhere.  We're not in a made-up scenario.  It's

in the federal government.  The $2 million is not in their possession, but the federal government has it, so I feel like that $2 million, Your Honor, we have assisted in.  Why?  Because the federal government reached out to me --

THE COURT:  I never heard of a U.S. Attorney's trust account.

MR. ROTH:  Well, Your Honor, let me explain.  There was a civil forfeiture proceeding in Washington, D.C.  The federal government attached $2 million of the Legacy money.

THE COURT:  So they did that.  It's not like you turned it over.

MR. ROTH:  No, no, no.  Yes, you're -- no, that's two sentences.

THE COURT:  Did you represent them in the --

MR. ROTH:  I represented --

THE COURT:  Did you represent somebody in the forfeiture proceedings?

MR. ROTH:  I represented Legacy in a forfeiture proceeding long ago in federal court.  And what happened was, I continued to represent Legacy, Your Honor, and the federal government said to me -- they came to me and said, "We are not going to release the money to

*SEC v. McKNIGHT*

the receiver unless Mr. McKnight agrees and Legacy agrees on the release. Because if, in fact, the SEC loses its lawsuit or the default is opened, we don't want the federal government, the U.S. Attorney's Office, we do not want to be in a situation where we've paid it over once and we have to pay it over again."

So I was actually instrumental, Your Honor, assisting -- I'm not saying I'm on hallowed grounds. I'm saying I was just helping in the process. That's all I was doing. But I assisted the receiver through the U.S. Attorney's Office in Washington, D.C. to obtain this $2 million.

I say "U.S. Attorney's trust account." I'm not a criminal lawyer. I don't know where it is. But the U.S. -- the federal government seized $2 million. They have it. And all we're waiting for -- some technical implementation of transferring it to the receiver.

But yes, Your Honor, I was helpful in that process. We were helpful. It wasn't just about a used car. The receiver was quite frankly -- they could have hired someone else. Believe me, I have better things to do than fly to Flint Michigan and go help a receiver with inventory.

THE COURT: What about this daughter?

MR. ROTH:  The daughter issue I think I would have Mr. --

THE COURT:  That's his -- that's not you?

MR. ROTH:  That's Mr. Spender.

I'd let Mr. Spender speak to that, because that's not really me.

THE COURT:  All right.  Okay.  All right. Is there anything else you want to tell me right now?

MR. ROTH:  That's it, Your Honor.

THE COURT:  Okay.

MR. ROTH:  That's it.  Thank you very much.

MR. SPENDER:  Good morning, Judge.

THE COURT:  Uh-huh.

MR. SPENDER:  That's a tough act to follow.

THE COURT:  You know, I mean, I think it's great that everybody wants to be helpful, but you guys may end up being volunteers.

MR. SPENDER:  Well, let me speak to the daughter issue.

THE COURT:  Yeah.

MR. SPENDER:  The fees that were charged that related to Mr. McKnight's daughter have been deleted from the fee application after having agreements with --

THE COURT:  First there were no --

MR. SPENDER:  -- Mr. Applebaum, who went through all of the Spender and Robb invoices and checked them for reasonableness, checked them for fees.  And after -- I mean, our bill was far in excess of the $26,000 that we're requesting the Court to enter today.

But after Mr. Applebaum went through all of our invoices and was prepared to file a petition on our behalf, they were examined by his office and we deleted a significant number of entries or for services that were performed that Mr. Applebaum on behalf of the receiver felt that were unnecessary, or should I say, did not benefit the receivership estate.  And all of those have been deleted.

THE COURT:  Well, the documents on Exhibit 4 from Spender & Robb --

MR. SPENDER:  Okay.  But Judge, if you'll look, the documents on Exhibit 4 total on the last page of the exhibit, some $32,062.

And what you don't have -- well, do you have on page one of --

THE COURT:  I have something that totals 19, it's crossed off and says 13, but --

MR. SPENDER:  Okay.  That's not the final page.  That's about five pages in?

THE COURT:  Okay, here, let me just -- I don't see anything that's crossed off that --

MR. SPENDER:  Well, if you look at page one of Exhibit Number 4, the date at the top is May 27th, 2008?

THE COURT:  Right.

MR. SPENDER:  Okay.  And down at the bottom it shows 14.8 in handwritten form?

THE COURT:  Right.

MR. SPENDER:  M-a-R 10.3, m-a-r 4.5?

THE COURT:  Uh-huh.

MR. SPENDER:  And those are revisions that were made.  So if you go five pages in, you'll see that a $19,000 balance became a $13,000 balance after it was vetted by Mr. Applebaum.  And that was to delete services.

Although the services weren't necessarily each one crossed off as it was deleted by Mr. Applebaum, the services were examined and they were reduced by the services that Mr. Applebaum perceived did not benefit --

THE COURT:  And how am I supposed to know this?

MR. SPENDER:  -- the receivership estate.

THE COURT:  There's no written response.  There's nothing --

*Marie Metcalf, CVR-CM*

24

*SEC v. McKNIGHT*

MR. SPENDER: Well, that's unfortunate, but I think the lack of a response may speak volumes to the fact the petition is appropriate. If -- you know, we attached, and I'm not going to go through each one, Judge, but we attached a significant number of e-mails back and forth between --

THE COURT: Okay. So tell me about the daughter. Are you saying you didn't charge for any daughter work?

MR. SPENDER: We did not. That has been taken out. That has been deleted and I think Mr. Applebaum will probably stand up here and agree with the representation I am making to this Court. And I see him nodding his head in the back.

THE COURT: Well, you know something, that really doesn't count on the record, does it?

MR. SPENDER: Well --

THE COURT: I mean, I hate to be harsh here, but I just don't think it's (a) my work to do the receiver's work and (b) my obligation to take nods of the head and silence as consent in a matter that deals with payments from victims to lawyers.

MR. SPENDER: Wait. Let me just talk to that for a minute. Judge, the work that was done by Mr. Robb on behalf of my firm is work that would otherwise

*Marie Metcalf, CVR-CM*

25

have to be done --

THE COURT:  By the receiver.

MR. SPENDER:  By the receiver or the receiver's counsel.

THE COURT:  And I agree.

MR. SPENDER:  But let me go one step further and then I'll address your question.  The work that was performed by Mr. Robb on behalf of my firm, for each hour worked it may have been a ten-hour job by the receiver or receiver's counsel.

And let me give you an example.  This is an e-mail that was sent from Mr. Applebaum, and this is part of Exhibit Number 2 in our initial brief.  This is an e-mail on May 14th, 2008 that Mr. Applebaum wrote to Mr. Roth, copied to Mr. Robb. and it says,

"Thanks.  I spoke briefly with the SEC this morning and indicated that yours and Greg's cooperation in going through the documents as opposed to simply handing them over was valuable and should bridge us through the next couple of weeks."

So not only was it work that the receiver or the receiver's counsel would otherwise have had to have done anyway, but it probably saved them a significant number

of hours that they would have had to bill the receivership estate because of the access to this information through Mr. Robb and Mr. Roth and the ability to provide them that information without a substantial or extended amount of work on behalf of the receiver or the receivership's estate.

And the receiver knew that. And the e-mails that went back and forth that are attached as exhibits that are part of this Court record without Mr. Applebaum filing a response, show the fact that they were -- they welcomed the help. They were willing to agree to pay for the help and, in fact, even drafted the petition. So the fact that the receiver or receiver's counsel has not filed a response --

THE COURT: Okay. Let me -- I'm still looking for Exhibit 2 that you're talking about. I do see Exhibit 2 as an e-mail from Richard Roth to Joel Applebaum dated May 12th; is that what you're talking about?

MR. SPENDER: That is the first of probably 60 pages.

THE COURT: All right. And you are looking at what page in there?

MR. SPENDER: Well, I'll have to count them in. I just tabbed mine. If you go back, they are

in chronological order, Judge.

THE COURT:  So what date are you referring to?

MR. SPENDER:  I am referring to a May 14th e-mail.

THE COURT:  Yes.

"Hopefully all the records were moved to Southfield, Michigan, so you can fly to Detroit"?

MR. SPENDER:  No.  At the very top -- may I just approach the bench and hand you mine?

THE COURT:  "We are good to go with the SEC"?

MR. SPENDER:  No.  At the very top it says.

"Allen Robb, Richard Roth, May 15, 2008."

That's at the very top of the page.

THE COURT:  Thursday, May 15th at 8:47?

MR. SPENDER:  That's correct.  Now, if you'll go to the bottom of that page, you'll see an e-mail from Mr. Applebaum to Richard Roth.  And the e-mail content is on the top of the next page.  These go in reverse order because each reply comes to the top. And if you look at the top of the next page, you'll see

what I'm referring to.

THE COURT:  "As you requested, I have

Enclosed the McKnight estimated

amount of --"

MR. SPENDER:  Yeah -- no, the top of that,
right above that.  It may be the two-hole punch takes it
off.

THE COURT:  It says, "Allen Robb and

Richard Roth."

MR. SPENDER:  Your Honor, is yours
two-hole punched at the top, Judge, where you --

THE COURT:  Okay.  Going to the other
direction,

"Thanks.  I spoke briefly with the

SEC and indicated that yours and

Greg's cooperation in going through

the documents.  I think we all agreed

to put this issue on a sworn

affidavit order.

MR. SPENDER:  Well, you skipped a part,

"As opposed to simply handing the

documents over,"

right?

THE COURT:  "-- to simply handing the

documents over was valuable and

should bridge us though the next couple of weeks."

MR. SPENDER:  So the services -- I mean, that's just an example.  If you read each one of these you'll see that the services that were performed were not only valuable to the receiver, but probably saved the receiver additional time in having to do things that they were not required to do as a result of the services that were performed.

THE COURT:  Is the receiver's billable rate $400 an hour?

MR. SPENDER:  Our firm was only billing -- a lot less than that.  Mr. Roth can address the $400 an hour; he's from New York.  Our firm was billing, I think $250, maybe $275 an hour.  Let me look at the invoices. I wish I could bill $400 an hour.

THE COURT:  Okay.  Let me hear from the SEC.

MR. SPENDER:  Thank you.

MR. BIRKENHEIER:  Thank you, Your Honor. I'll be very brief.  Several --

THE COURT:  You don't have to be very brief.  You're here with an obligation to argue your advocacy position.  You have no obligation to be brief.

MR. BIRKENHEIER:  Thank you, Your Honor.

I will say, though, that several of the points I planned to make ahead of time and intend to make again are things which you have raised in your questioning of the defense.

I -- first, this is not a bankruptcy proceeding, as you noted. This is a fraud case. And the money we're talking about here is not just the remains of a business entity that has failed. These are the monies that the commission has traced from the victims into the accounts controlled by the defendant, Gregory McKnight.

Our accounting shows that during the relevant time period there was, as a practical matter, an infinitesimal amount of money that came to McKnight that did not come from the victims. Of the 70-plus million, virtually everything came from the victims and are the only source of money in this whole case. And that's what's left and that's what we're talking about spending here this morning, is money that came from McKnight's victims.

The law in this kind of case is very different than it is in a bankruptcy proceeding. There's a general rule that's been announced by multiple courts and been followed by multiple courts, that the victim's money should not be used to fund the defense of the defendant.

Now, the relief here that the SEC is seeking is equitable.  The asset freeze is a form of equitable relief, disgorgement is equitable relief.

The Court, of course, has the authority to release funds as it believes is equitable and just.  But in this case, it's the SEC's position that we think the facts show that it would be manifestly unjust and unfair to the victims to release over $100,000 or under $100,000 or -- I'll come back to that uncertainty in a minute -- in order to pay legal -- or to pay for legal representation that really is part of the defense of Mr. McKnight.

Now, another point which you raised earlier, and which is a big part of our position here, is that all of this work benefitted Mr. McKnight, especially in the context of that criminal case.  As you said, Your Honor, cooperating with the receiver, helping to find assets, helping to turn over assets, those are all things that redound -- or will redound if there is a prosecution to Mr. McKnight benefit down the road.

And I think that the -- you can see the purpose in that kind of activity on his part, on Mr. McKnight's part.  It's reflected by the fact that the bills that were submitted show by our count 38 conversations or conferences between Mr. Roth and/or Mr.

*SEC v. McKNIGHT*

Robb, and the criminal defense lawyer, Mr. Wishnow.  I mean --

THE COURT:  There's also conversations with the Assistant U.S. attorney.

MR. BIRKENHEIER:  And with the Assistant U.S. Attorney, yes, absolutely.  That's a big part of what's going on here, is that cooperation.

Second, many of the things that have been pointed out by the petitioners are items that Mr. McKnight was required by the asset freeze order and by the order appointing the receiver, to do.  He had to turn over the assets.  He had to return that Mercedes.  He had to return the cash that he had squirreled away for a rainy day.

He -- and the cooperation with the receivers, although it's less fair, we think that's something that he needed to do under the orders also.  And even if he didn't, again, it's something that would benefit to his -- would redound to his benefit if there is an ultimate criminal prosecution.  You know, basically --

THE COURT:  Or if he can cooperate enough and return enough, there won't be a criminal prosecution.

MR. BIRKENHEIER:  That -- no, I can't speak to that specifically.

*Marie Metcalf, CVR-CM*

*SEC v. McKNIGHT*

THE COURT:  I can.

MR. BIRKENHEIER:  Yes, Your Honor.

Also, there are some things that haven't been done yet.  I mean, the -- they did not consent to a permanent injunction.  Mr. McKnight did not consent to a permanent injunction, but instead took a default.  And I believe, as I read the e-mails that were submitted in support of the petition, that was because of considerations stemming from his criminal defense.

He also -- we posed -- the SEC posed to Mr. McKnight at the very outset of the case that list of about 15 to 20 questions going to material facts relating to the tracing of assets and the locations of assets.  He still has not answered those questions.

Now, that's fine.  We're not complaining that he hasn't answered, because he has a right not to give us information under the Constitution, but he can't come in here and talk about all the cooperation that he and his lawyers have provided with the general theme about how they're helping and helping, when, you know, it's not the case that they've also helped.

They've made careful decisions, I think, as they have to, on his behalf, about what things they can do and what things they can't do.  And that brings us back to the point that what they really were doing was

representing Mr. McKnight, not benefitting the receiver.

Finally, as far as this issue about the benefit, the billing statements that are submitted in support of the application do not clearly show what items of work were for the receiver's benefit, what items of work were not for the receiver's benefit.

The Court is left to pick its way through these billing statements and guess about what things should be reimbursed. Now, it may be that the position of the petitioners is that everything in those billing statements is what they're seeking to be paid for, but I think that's untenable, just on the face of the documents.

There's a lot of stuff in those billing statements that doesn't seem to have any connection to the receivership estates, so I don't think that can be their position. Or maybe it is, but I think that that should be rejected out of hand.

The commission's position is again, is that it would be profoundly unfair and unjust for the victims to have money released, certainly the amount that -- I'm uncertain about the amount. Let me say here -- I'll just digress here to say that. It's not clear to me what the amount is. I'm not clear if the billing statements that were submitted are those that were

prepared after the receiver had gone through them and negotiated a reduction.

There was a subsequent reduction of some sort that is reflected in the petitioners' reply papers, but those papers only talk about a number of hours being reduced from each bill without identifying the particular entries that are being reduced, so that the Court's still left in the dark as to exactly what's in, and whether any of that stuff that the petitioners want in is stuff the Court agrees with.

Having said that, the commission's position is that it would be again, unfair and unjust to the victims for the remaining funds to be used to pay for what, in reality was Mr. McKnight's defense.

If the Court disagrees with that position, I would ask that the Court at least require the petitioners to submit a new motion with new supporting documentation that focuses precisely on what it is they're seeking to be reimbursed for and why they think all of those -- each and every one of those entries is supportable under their theory and then afford the commission an opportunity to respond to that renewed motion.

Thank you, Your Honor.

THE COURT:  Anything else anybody wants to

say?

MR. ROTH: May I be heard again, Your Honor?

THE COURT: Sure.

MR. ROTH: Some things were raised. I just wanted to elaborate on them. And I will be brief.

Mr. Spender somewhat hit the nail on the head and I just wanted to elaborate, Your Honor. The receiver, under the Court order, in the order appointing a receiver, the receiver was empowered to gather assets and could do, and it's in our motion papers, what it sees fit in an attempt to gather assets.

We didn't thrust ourselves, if you will, Your Honor, into assisting. We had a discussion with the receiver and we believed and the receiver believed, that since we were the ones with the most knowledge, we could be the best to assist.

And the best example that Mr. Spender gave, which didn't occur to me until after he said it, where that little last line of that e-mail says, "to assist us in the sworn affidavit issue," that sworn affidavit issue is just but one issue, Your Honor. It's not on the papers and it just hit me.

The SEC submitted a vast affidavit of finances from an accountant as to where all the money

went. And I told the receiver that there were a lot of -- I told the receiver I believed, in light of what I knew about the history of the case, there were a lot of problems about that affidavit. The receiver was about to retain an accountant and go through boxes of documents to see if the SEC's analysis was correct. That task alone would have cost $20, $25,000, in my belief, because it was a tremendous amount of financial gathering.

What happened was, we assisted the receiver in attempting to give the receiver information to no longer need that accountant. So the point is -- that's just one example, Your Honor.

Another example, which I don't know if it's in our papers, is that I was the only one with information of where -- of where the private placements were. Mr. McKnight had private placements in a brokerage firm in Florida, in a commodities firm which the receiver did know about, and I hooked the receiver up with the brokerage firm, with the lawyers for the brokerage firm.

I attempted to assist, too, as Mr. Spender said, to save the receiver from hiring someone else as it could do pursuant to the Court order and have another lawyer do the investigation. We actually saved, we believe, tens of thousands of dollars in money. Yes, it took us our time. But it was essentially -- what the

receiver thought, and by not putting in opposition papers, Your Honor, it speaks very loudly what their position is.  They're not objecting to our application, because they said they were going to make it for us.

But by putting -- by bringing us in, as opposed to someone else they could have brought in through -- pursuant to the Court order, they saved tens of thousands of dollars because it would have been a new law firm, looking at this thing anew, and having to revamp everything that happened.  So I think, Your Honor, we did significantly benefit the estate, significantly.

A couple other quick things, Your Honor. The $400 an hour fee was something that was discussed with Mr. Applebaum.  I told him -- in fact, it's the first e-mail in the exhibit.  I told him what our customary rates were in New York and he said, "that's high."

And I talked to him.  I said -- he said to me, "What we like to do," my recollection is, he said, "What we like to do is do a blended rate so there's no issue of different rates."

I told him my rate is five -- I think it was five-and-a-quarter at the time, and we agreed.  We agreed to a $400 an hour rate.  Why?  Because it was a negotiated discussion pursuant to Court order that the

receiver was allowed to enter into.

So all we're doing, Your Honor, here, quite frankly, is trying to enforce an agreement between the receiver and the lawyers, which was entered into pursuant to the Court's order.

A couple other issues, Your Honor.  The 20 questions that the SEC asked about, we were in the middle of -- we were in the positon of -- just so we're clear, SEC wants the answers to 20 questions.  Mr. McKnight has a criminal lawyer saying he won't answer these questions.  So we were trying to negotiate, trying to give the SEC the information without verbally giving -- because my knowledge of the Fifth Amendment is you can give documents.  It doesn't waive the privilege, generally, but you can't speak.

So we were trying to come up with ways to get from the lawyer for the -- his criminal lawyer, the information through documents, so we could say, "Listen, we can't tell you how -- we can't say to you orally there was $150,000 in this bank account, but here's a monthly statement that shows you it."

Therefore, we're not waiving his Fifth Amendment privilege, which he's engaged -- which he has with his criminal counsel, and we're giving the receiver, and this is by way of example, Your Honor, the

information that it needs.

So the 20 questions, we didn't verbally answer them, but we tried to spell out -- they had questions about accounts in Turks & Caicos.  We gave them documents.

They had questions about accounts all over the place.  We tried to find, locate and give them documents.  And the reason why we did it, was because we were the ones that had the superior knowledge.

So I do believe that we have saved significantly, Your Honor, the estate money.  We did not do this for the benefit of Mr. McKnight.  We really didn't.  We did it for the benefit of the receiver, pursuant to my agreement with the receiver.

Your Honor, I don't even know what's going on in the criminal proceeding.  I've not spoken to the criminal lawyer in six months.  Back then I did on the Fifth Amendment issue.  But I did this, because --

THE COURT:  Your -- is this your initial e-mail, Mr. Roth?

MR. ROTH:  Yes.

THE COURT:  You have asked us to submit to you what defendants have to do in this matter.

MR. ROTH:  Yes.

THE COURT:  Defendants must answer the

complaint, negotiate an injunction order, meet with the client, raise the case on the merits, which includes discovery --

MR. ROTH:  We didn't do any of that, Your Honor.  You can stop -- I'm sorry to interrupt you.  We didn't answer the complaint.

THE COURT:  That is how you came into the case.

MR. ROTH:  No, but -- but the --

THE COURT:  And now, all of a sudden, "Oh, it's not about Mr. McKnight."  And then you go on to talk about $20 to $25,000 a month for work you're doing for the defendant and that Mr. McKnight needs $7,000 a month to live on.

MR. ROTH:  And that was -- that was our first e-mail.

THE COURT:  Is this not for Mr. McKnight?

MR. ROTH:  That was our first e-mail, Your Honor.  If I will -- Your Honor, if you will, and the e-mails continue, there were -- the conversations morphed.  We never answered the complaint.  We never took discovery.  We never did any of that.  In fact, we --

THE COURT:  No, but it is clear you are representing Mr. McKnight.

MR. ROTH:  Your Honor, it's not what

happened. Your Honor, the receiver had a right under the Court order to retain counsel to help him gather assets.

THE COURT: I think he does --

MR. ROTH: That's what we did. Your Honor, did it help --

THE COURT: Do you have a retention agreement with him?

MR. ROTH: With the receiver? No, I don't have a -- I don't have a formal agreement, but I have his lack of opposition, the fact that he made an application and draft, which is -- confirms performance. I clearly have prior performance, Your Honor here. I do not have a retainer agreement with him.

THE COURT: Okay.

MR. ROTH: I think -- yeah, I think I'm done, Your Honor.

On the AUSA, the Assistant United States Attorney, I haven't looked at my bills in a long time. If I spoke to that Assistant U.S. Attorney myself, this is not the Spender firm, three times, I'd be surprised. I wasn't involved in the criminal case, Your Honor. I spoke to Mr. Wishnow a lot, but I really -- just on the issue of trying to get information for the SEC.

And, Your Honor, all I can say to you is,

finally, is that this did benefit the estate tremendously.

THE COURT:  Is there anything else anybody wants to say?

MR. ROTH:  I'm sorry?

THE COURT:  Is there anything else anybody else wants to say?

MR. ROTH:  Thank you, Your Honor.

MR. BIRKENHEIER:  Yes, Your Honor.  I'd like to address one point that Mr. Roth raised.

Mr. Applebaum can correct me if I'm wrong about this, but I understand that Spender & Robb and the Roth Law Firm were, in fact, not retained by the receiver.  The receivers, under the order, his practice has been, and I believe this is required under the order, but in any event, his practice has been to seek leave of the Court to confirm the -- not to say leave, but to confirm the retention of the law firm, Clark Hill and a couple of other firms that he hired to do other types of work.

There's never been anything like that done with regard to Spender & Robb or the Roth Law Firm.  And in fact, for the petitioners, I would think that would cause them tremendous conflict problems if it had been done.

*SEC v. McKNIGHT*

But there is -- and that was not done. And as for the agreement with the receiver, the agreement -- the most the receiver could undertake to do would be to come to the Court and ask for leave to disburse funds for this purpose. He could not on his own, agree to pay the money.

Thank you, Your Honor.

THE COURT: Okay. For -- after considering carefully these e-mails, the billing records, the request of the attorneys here on the SEC's response, I'm denying the motion for fees.

This is not a bankruptcy case. There are not assets from a failed business that, appropriately or inappropriately, but under the law can be distributed to attorneys.

These are monies from victims. It is clear to me what while the estate may have benefitted from assets that were produced with the assistance of the attorneys, that the attorneys have represented Mr. McKnight and his relatives and associated entities from the beginning and continued to do so.

Any benefit to the estate, I think was essentially collateral to the benefit to Mr. McKnight in both the SEC case and the criminal case. There is not a retention agreement with the receiver. I personally have

*Marie Metcalf, CVR-CM*

difficulty understanding why there should be any space between the receiver and the SEC.

I've had similar cases before with somebody called a conservator in an SEC case, and it -- it has been my experience that there isn't any space, that the receiver or the conservator in that case is essentially charged with making the estate as big as possible for the benefit of the SEC.

So why there is a differential is unclear to me.  And in those cases, the conservator always came to the Court for permission to disburse all funds and submitted complete and appropriate records.

The absence of an application from the receiver, the absence of a response to this motion, the absence of a review and approval statement to me, militates against granting the motion.

Even if there had been such a response, I would still determine that under the facts of this case, there are really no independent assets which can be disbursed to pay the lawyers.

There is an ongoing criminal case.  The complaint was dismissed, but it -- it doesn't appear to me that it's necessarily gone.  I don't see any citation to authority that would permit victims' assets to be paid -- be given to the lawyers who represent the defendants

in an administrative proceeding that has the criminal allied case, and while I am very appreciative as a member of the bar, that the lawyers did all this work, I do not see any legal basis to pay them from these victim assets, and so I'm denying the motion.

Thank you.

(Audio interruption)

(Audio resumes)

THE COURT:  -- that there doesn't seem to be actually a number of requests of parsing of the numbers, and so even if somebody overrules this, that issue would still have to be addressed.

(Court in recess at 10:42 a.m.)

*            *            *

*Marie Metcalf, CVR-CM*

47

*SEC v. McKNIGHT*

**C E R T I F I C A T I O N**

I certify that the foregoing is a correct transcript from the digital sound recording of the proceedings in the above-entitled matter and has been prepared by me or under my direction.

\s\Marie J. Metcalf                    02/25/09

Marie J. Metcalf, CSMR-3274, CVR, CM      (Date)

*Marie Metcalf, CVR-CM*

48